# Hillman Land & Iron Company v. Commonwealth, By, et al.

(Decided May 14, 1912.)

## Appeal from Lyon Circuit Court.

1. Taxation—Assessment of Land.—Under the assessing statute, as well as under the prevailing custom, farming land is valued—not by the tract or body, but by the acre; and as the taxpayer is presumed to know the number of acres that he owns, it is his duty to state the fact; and if he reports a less number of acres than he owns, the surplus may be assessed as omitted property.

2. Taxation—Assessment of Land—Omitted Acreage.—The presumption is that the tax payer has only valued the number of acres that he has assessed, and consequently when he seeks to avoid taxation on omitted acreage, it is incumbent upon him to establish by the most convincing evidence that the omitted acreage was taken into consideration in fixing a valuation on the acreage listed, and that the value fixed was a fair value for the entire body, although it contained a greater number of acres than was specified in the assessment.

3. Taxation—Assessment at Fair Value, Although Number of Acres Understated.—If the taxpayer understates the number of acres owned by him, but the value fixed on the number of acres assessed is a fair value for the entire tract owned, and he can show this by convincing evidence, the acreage omitted should not be again assessed.

4. Taxation—Evidence as to Value of Land.—The value of land for assessment is its cash value estimated at the price it would bring at a fair voluntary sale; and witnesses should be asked questions that will develop this value; but they may be asked other pertinent questions for the purpose of illustrating the theory upon which they based their opinions as to its assessible value.

5. Taxation—Bank Deposits of Non-resident.—Where a non-resident is carrying on business in this State, money that is sent here from its home office in another State and put on deposit in a bank in this State for the sole purpose of defraying current expenses of its business, is not subject to taxation in this State.

6.  Taxation—Bank Deposits of Non-resident.—Money that is derived from the business of a non-resident in this State, and that is placed on deposit in a bank here, is subject to taxation; and so is the money of a non-resident that is permanently on deposit in this State, or that is in the custody of an agent or fiduciary within this State, who manages and controls it by lending it out, investing it, collecting the interest, and the like.

7.  Taxation—(Bank Deposits of Non-resident.—If it were shown that the practice of sending out of this State money derived from business done in this State, and the returning to defray expenses of money to take the place of that sent out, was a device or scheme to evade the tax laws of this State, the money sent here to pay expenses would be subject to taxation.

8.  Taxation—Sufficiency of Levy for Fiscal Court.—A levy by the fiscal court "to defray current expenses, such as salaries, maintenance of paupers, building of bridges, working of roads" is a sufficient compliance with section 180 of the Constitution.

9.  Taxation—Validity of Levy Does Not Affect Assessment.—The validity of a levy can only be assailed when it is sought to collect taxes under it; and where the only question involved is the right to assess property, the validity of the levy is not to be drawn into question.

C. C. GRASSHAM, N. W. UTLEY and BERRY & GRASSHAM for appellant.

MAT J. HOLT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

This was a proceeding instituted by a revenue agent for the purpose of having assessed for the years 1905-6-7-8-9 as omitted property 6,292 acres of land owned by the appellant company, a foreign corporation, and situated in Lyon County; and, for the purpose of having assessed for the same years as omitted property money on deposit to the credit of the appellant company in banks located in Lyon County.

Upon hearing the case, the circuit court ordered to be assessed for the years mentioned as omitted property the land, as well as the deposits in banks.. From the judgment of the circuit court, this appeal is prosecuted.

Taking up first the question of the assessment of the land, it appears from the record that the appellant company in 1901 purchased a large body of land situated in Lyon, and adjoining counties. The deed to the appellant company for this land does not describe the number of acres in the tract, but refers to other deeds

for a description of the property conveyed. It is not, however, denied that during each of the years mentioned the company owned in Lyon County 13,292 acres of this land, and, it is admitted that it only assessed during these years 7,000 acres of land in that county.

Conceding these facts, it resists the effort of the Commonwealth to have assessed as omitted property the 6,292 acres of land, upon the ground that its agent in Lyon County did not know the number of acres of land it owned in Lyon County, and that the value at which it assessed the land—believing that it contained 7,000 acres—was a fair value, although there may have been in the tract assessed 13,292 acres in place of 7,-000 acres. The argument being that if the amount at which it assessed the land was the fair assessible value of all the land it owned in Lyon County, it is not a matter of material importance whether it described accurately or not the number of acres in the tract assessed.

On the other hand, it is the contention of the Commonwealth that the company knew that it owned the number of acres it now admits it did own, and that it purposely omitted from assessment the excess over 7,-000 acres now sought to be assessed.

The resident agent of the appellant, who gave in the land for assessment, testifies that he did not know how many acres of land was contained in the body, and that he assessed it at 7,000 acres, believing that this was a fair estimate of the number of acres, and that there was no intention upon his part, or on the part of the company, to purposely omit from assessment any land owned by it. Of course, the resident agent in assessing the land acted on behalf of his principal, the company, and, although he may not have known how many acres the tract contained, it is hardly probable that the company did not know approximately at least the number of acres it owned in Lyon County. The discrepancy in the number of acres assessed and the number of acres actually owned is too large to be entirely accounted for upon the theory of inadvertance or mistake. So far, however, as this proceeding is concerned, it is not important why this large acreage of land was omitted from assessment. If it was liable to assessment, the fact that it was omitted by mistake or inadvertance would not excuse the company from now paying taxes upon it; and if it was intentionally omitted, the situa-

tion would be the same. If the taxpayer, believing in good faith that he is the owner of only 500 acres of land, assesses that number of acres, when in fact he owns 550 acres, of course 50 acres has been omitted from taxation; and so if he knows he has 550 acres, and intentionally assesses only 500 acres, 50 acres has been omitted. In either event, it is an omission, and the good faith or bad faith of the taxpayer does not affect the question of the assessibility of the omitted acreage.

Section 4056, of the Kentucky Statutes, provides in part that—

"Persons listing their estates with the assessor shall state separately the tracts of land, the number of acres in each tract, the price per acre, and the improvements thereon, the name of the nearest resident thereto, and where situated, giving election precincts in which it is situated." * * *

In the schedule the taxpayer must sign and verify, in giving in a list of his taxable property items 12, 13, 14, and 15 require that he shall state in separate items the number of acres of land owned by him, the value per acre, the nearest resident thereto, the election precinct in which it is situated, and the valuation of each tract with improvements.

It is obvious that the purpose of requiring the taxpayer to give the number of acres of land is to enable the assessor and the board of supervisors, whose duty it is to revise and correct assessments, to know how many acres of land the taxpayer owns, so that they may have the aid of this information in fixing the value at which it should be assessed. Under the statute, as well as under the prevailing custom farming land is valued, not by the tract or body, but by the acre, and, although the number of acres is assessed at a lump sum, it is of course easy when the acreage is given to ascertain the price per acre at which it is assessed. The taxpayer is presumed to know the number of acres that he owns, and this information the assessor and the assessing authorities generally obtain from his sworn statement. It is true they could, in nearly every instance, by an examination of the records learn the number of acres of land owned by each taxpayer, but the almost universal rule is to accept the statement of the taxpayer as to the number of acres of land owned by him. The assessing officers seldom know the number of acres that a taxpayer owns, but as a rule they do know the value of land

per acre in the neighborhood in which he lives; and it is practically altogether on this knowledge of the value per acre that they decide whether or not the value fixed by the taxpayer is correct. So, if the taxpayer owns 500 acres, and assesses it at say $10 an acre, the assessor and board of supervisors can easily determine whether it is a fair valuation; but if he owns 525, or 550 or 600 acres and reports 500 acres, the assessor and the board of supervisors will, as a rule, value the land according to the number of acres that he has listed, and the land he has not listed will escape taxation, as these authorities would not take into account in placing a valuation upon the land listed the land that had been omitted. In view of these facts, it is apparent that the taxpayer should be required to state with reasonable certainty the number of acres of land he owns, as if he gives in a less number of acres than he owns, the effect as a rule is to mislead or deceive the assessing authorities as to the value at which his land should be assessed. Nor will the valuation fixed on the number of acres listed be treated as a fair valuation of a larger number of acres, unless there is strong proof to support it, for the simple reason that the presumption is that the acreage not listed was not taken into account in the assessment of the property. It is not to be presumed that a taxpayer who assesses 500 acres of land at $10 an acre has included in the valuation 600 acres of land. The fair and reasonable presumption is that he has only valued the number of acres that he has assessed. Consequently, when the taxpayer seeks to avoid taxation on omitted acreage as shown by the record or by admission it is incumbent upon him to establish by convincing evidence that the omitted acreage was taken into consideration by him in fixing a valuation on the acreage that he listed, and that the value fixed was a fair value for the entire body, although it contained a greater number of acres than was specified in the assessment. And this rule should be applied, whether the discrepancy in the number of acres returned by the taxpayer and the number owned is great or small. There are few land owners who do not know with reasonable accuracy the number of acres they own—at any rate, when they return for assessment less than they own as shown by the record or by admission the burden should be on them to show that the discrepancy did not affect the value at which the land owned should have been

listed. No injustice or hardship is imposed on the land owner in requiring him to return the number of acres he owns, while on the other hand great injustice would be done the State and county and taxing districts if he should be exempted from taxation on omitted acreage on the mere unsupported statement that he did not know how much he owned or that the value given was a fair value for the listed as well as the omitted acreage. It is suggested that we should lay down some rule permitting a certain per cent. of the land owned to be omitted without burdening the taxpayer with the necessity of responding to a proceeding to have the acreage omitted assessed as omitted property. But this can not in justice or without ignoring the Constitution, be done. There is much land in the State worth $100 and $200 an acre, and manifestly it would be unjust to hold that unless the discrepancy was say ten per cent., it should be treated as of no moment. Under such a rule, the owner of valuable land would escape taxation on a material part of his property. But, aside from this, to lay down such a .rule would be to authorize and encourage owners of valuable land to omit the per cent. of the acreage allowed, and, moreover, would be a palpable violation of the Constitution which requires that all property shall be assessed. Upon no theory can the exemption of a certain per cent. be legally or justly authorized. But when the burden is put upon the taxpayer to show that the value of the land returned included the value of all, whether the discrepancy is great or small, and without regard to the value of the land, no inequality and no injustice will be done. Nor is it at all probable that under this rule the land owner who makes only a trifling mistake will be subjected to annoyance or expense.

In Commonwealth v. Robinson-Norton & Co., 146 Ky., 218, we ruled that revenue agents could not re-assess or re-value property that had been listed at an undervaluation, but that they could only have property assessed that had been omitted from assessment. So that, if the question here was merely an undervaluation of the property, and not an omission, the proceeding by the revenue agent to have it assessed could not be sustained. The question of undervaluation, however, is not presented in this record. The theory upon which counsel for appellant proceeds is that the valuation of $5.30 an acre, or $37,100, at which the company listed 7,000

acres of land was in fact a fair valuation for the entire 13,292 acres owned by it. And to this phase of the case we will now address ourselves.

We acknowledge the force of the argument of counsel for the appellant that when the taxpayer has placed a fair valuation on his property, it is not a matter of great importance whether he has described it accurately or not as the State has not lost anything by the misdescription, and we will now take up this argument to see how the case for the appellant stands. It assessed for each of the years named 7,000 acres of land in Lyon County at a total valuation of $37,100 or $5.30 an acre, and now insists that although it owns 13,292 acres, $37,-100 was a fair valuation for the whole tract during these years. Or, to state it differently, the effect of the contention is that its entire body of land should only have been assessed during these years at $2.65 an acre. If this conclusion should be accepted as sound, and the statement of its agent that he did not know that the body of land contained over 7,000 acres be accepted as true, the appellant would be placed in the attitude of having assessed this 7,000 acres at twice its assessible value during each of these years. To agree that $37,-100 the valuation fixed by it on 7,000 acres was a fair valuation for 13,292 acres, we would have to believe that it assessed the land it thought it owned in these years at practically double its value.

But, passing this curious situation, if the evidence clearly and convincingly showed that appellant assessed at its fair value all the land owned by it, the discrepancy between the number of acres given in and the number of acres owned would not warrant the re-assessment of the omitted acreage as omitted property, because in this state of case no property would in fact have been omitted or indeed undervalued. But the burden was on appellant to show by clear and convincing evidence that the valuation at which it returned the 7,000 acres was a fair valuation for the 13,292 acres that it owned; and this, the evidence does not do.

The witnesses for the appellant testified that the fair cash value of the land, estimated at the price it would bring at a fair voluntary sale at the assessing period was not over $2 an acre; while the witnesses for the Commonwealth said that it was worth from $6 to $8 an acre. But as some of the witnesses for the Commonwealth were not asked what was the fair cash value of

the land estimated at the price it would bring at a fair
voluntary sale at the assessing periods, it is urged that
no weight should be attached to the evidence of the
witnesses who were asked this question. The Constitu-
tion and the statute both provide that property shall be
assessed at "its fair cash value, estimated at the price
it would bring at a fair voluntary sale." This, of
course, is the test that should be applied in determining
the value of property for the purpose of assessment and
taxation; and when it is attempted to show the value of
property by witnesses, they should be asked this ques-
tion. The fact, however, that the answer to this ques-
tion furnishes the test of the assessible value of prop-
erty does not make inadmissible or incompetent ques-
tions that may be asked for the purpose of showing how
the witness arrived at this value, or for the purpose of
illustrating his knowledge of the value of the land, or
the theory upon which he basis his opinion as to its asses-
sible value. For the purpose of getting information
that will either discredit or support the statement of
the witness upon the test question, he may be asked any
other relevant pertinent questions. If, however, we
should put aside the evidence of the witnesses for the
Commonwealth who were not asked the test question.
we think there is sufficient evidence in the record, to-
gether with the presumption that should be indulged in
against appellant, to support the finding of the trial
judge that the 6,292 acres should be treated as omitted
property and that the value for purposes of assessment
of the land omitted was the same per acre as the value
of the land that was assessed. The trial judge fixed the
value of the 6,292 acres omitted at $5.30 per acre—this
being the value placed by appellant on the 7,000 acres
that it assessed, as shown by its assessment, and we
concur in the judgment of the lower court upon this
point.

Taking up now the assessment of the deposits in
bank, we find a close and difficult question. The evi-
dence upon this branch of the case is substantially this—
the appellant company has its home office and principal
place of business in St. Louis, Missouri. The land
owned by it in Lyon and other counties in this State was
thought to be valuable for the minerals it contained,
and it was chiefly for the purpose of developing the sup-
posed mineral resources that the land was bought.
Previous to 1905, it was discovered that the mineral re-

sources were of little value, and, after the expenditure of a large amount of money in an effort to develop these resources the scheme was abandoned, and since its abandonment the land has been used chiefly for farming and grazing purposes; but, even for these purposes the venture has not been a success. The evidence shows that the expense of the appellant in its business and farming operations in this State during the years 1905-1909 was more than its income and that it carried on the business at a loss. It is also shown that all the money received as income from this property was at once forwarded to the home office at St. Louis, and that the money in bank sought to be assessed was sent from the home office in Missouri to the resident agent in this State to be used by him in paying over-due and current expenses, and that a good deal of it was sent shortly before the assessing periods in the years named. It is further shown that no part of this money was sent to this State to be kept here on deposit, or for investment or to be loaned in any manner whatever. In short, the evidence shows that the money on deposit sought to be assessed was only in the State for the temporary purpose of defraying the current expenses of appellant company in the conduct of its business in this State and that the income of the business here was not sufficient to carry it on.

Upon this state of facts, was this money a proper subject for taxation? To state the question in another way, if a foreign corporation, engaged in business in this State, sends money to its resident agent in this State for the sole purpose of defraying the current expenses of its business in the State—the income from which is not sufficient to meet expenses—and it is used for this purpose alone, has it a situs in this State for taxation?

The attorney for the Commonwealth in support of the proposition that these deposits were proper subjects for assessment and taxation, relies upon the case of Commonwealth v. R. G. Dun & Co., 126 Ky., 109. It appears from the opinion in that case that the home office and principal place of business of Dun & Co., was in New York, but it had an established agency and office in this State, and had transacted business in this State for many years. That at the assessing periods in 1900-1-2-3-4, it had on deposit in banks in this State money that was sought to be assessed, as in this case, as omitted property. It is stated in the opinion that—

"There was due to the Louisville office from sub-scribers (or persons transacting business with appellee) on each of the above assessing dates about $5,000. The income from the Louisville office for each of the years named was about $40,000, which was deposited in the banks, on which the manager drew checks for all current expenses, and at the end of each month, if there was any substantial balance on deposit, he would remit to the New York office. It is conceded that the money deposited in the banks, and the amounts due at the assessing dates referred to, were omitted from assessment and taxation; but appellee claims that the situs of these deposits and the debts due appellee on the above-named assessing days, for the purpose of taxation, must be deemed and considered to exist in New York, the home of Dun's heirs, devisees, and trustees managing the estate."

After stating that the money in bank and the debts due by Dun & Co. were personal estate subject to taxation under the statute, the opinion proceeds:

"This court, however, in construing this statute, has determined that it does not apply to the property of non-residents when in this State temporarily; that in such a case the situs for the purpose of taxation is at the domicile of the owner. * * * But this court has never held that when a non-resident of this State establishes a business in this State, from which money is derived, and other property is accumulated, such property should be relieved from taxation. In our opinion the accumulations from the business of appellee are not temporarily in this State, in the meaning of the decisions referred to. In this case we have a non-resident with an established business, agents residing here who manage it, and an income of over $40,000 annually."

In the Dun case, the decision that the deposit in bank was subject to taxation was put upon the ground that the deposit accrued from business carried on by Dun & Co. in this State through an established agency in this State. In this case the evidence shows that the money on deposit was not earned or accumulated in this State, but was sent here from another State for the purpose of being checked out to pay debts due by the non-resident. It was not the profit or accumulations of any business done in this State. If this money on deposit was the proceeds of the farming or business operations

of the appellant in this State, then this case would be controlled by the Dun & Co. case.

The case of Bluefield Banana Co. v. Board of Assessors, 49 La. Ann., 43, is also relied on by the Commonwealth, but in that case, as in the Dun & Co. case, the money on deposit that was taxed was accumulated from business transacted by the non-resident in New Orleans. As stated in the opinion:

"The corporation had an agent here where it received and sold fruit and received the price for the same. A part of the proceeds were withheld in the hands of the agent for the purposes incidental to the prosecution of its business, and a part deposited to the credit of the company subject to the check of its local agent, also for the prosecution of its business here and for such other purposes as the company might direct it to be applied to. The company prosecuted business in New Orleans precisely as did resident business men and firms. It received all the advantages to be derived from the State and city governments which residents received. We see no reason why it should not be taxed as claimed in this proceeding, unless there be insuperable objections in the way."

In case of In Re Houdayer, 150 N. Y., 37, the question before the court was whether an inheritance tax could be imposed by New York on the succession to a deposit in a New York bank to the credit of a non-resident who had died. In holding that it was subject to the tax, the court in the course of the opinion said:

"The decedent brought his money into this State, deposited it in a bank here, and left it here until it should suit his convenience to come back and get it. While the commingling of funds may complicate administration, it does not change the facts as thus stated. If he had deposited in specie, to be returned in specie, there can be no doubt that the money would be property in this State subject to taxation. But, instead, he did as business men generally do—deposited his money in the usual way, knowing that not the same but the equivalent would be returned to him on demand. While the relation of debtor and creditor technically existed, practically he had his money in the bank and could come and get it when he wanted it. It was an investment in this State, subject to attachment by creditors. If not voluntarily repaid, he could compel payment through the courts of this State. The depository was a resident

corporation, and the receiving and retaining of the money were corporate acts in this State. * * * Conceding that it was intangible, still it was property in this State for all practical purposes, and in every reasonable sense within the meaning of the transfer tax act.''

In the Dun case, in the Bluefield Banana ·Co. case, in the Houdayer case, in Blackstone v. Miller, 188 U. S., 189, 47 L. Ed., 439; New Orleans v. Stempel, 175 U. S., 309, 44 L. Ed., 174; Buck v. Beach, 206 U. S., 392, 51 L. Ed., 1106; Metropolitan Ins. Co. v. City of New Orleans, 205 U. S., 395, 51 L. Ed., 853; State Assessors v. Comptoir Natl. D., &c., 191 U. S., 388, 48 L. Ed., 232; Liverpool & London Inc. Co. v. Board of Assessors, 221 U. S., 346, 55 L. Ed., 762; Commonwealth v. Peebles, 134 Ky., 121; Commonwealth v. West India Oil Ref. Co., 138 Ky., 828, and in many other cases decided by this and other courts, it has been firmly settled that money or intangible property of a non-resident is subject to taxation in the State in which it has an actual situs for business purposes, as when it is in the custody of an agent or fiduciary within the State who manages and controls it by lending it out, investing it, collecting the interest, and the like or when it is the accumulation or income from the business done in the State or when it has been placed permanently on deposit. But the principle applied in this class of cases does not reach the question we have before us. If the money sought to be taxed had been sent to this State to remain here on deposit, or was on deposit for permanent purposes, or if it was the accumulation or income derived from the business done in this State, or if it was sent here for the purpose of being invested, there would be no difficulty in holding that it was subject to taxation. But the uncontradicted evidence shows that no one of these conditions existed with respect to this money. It was the custom and practice of the resident agent of appellant to forward to it at St. Louis as soon as received all money collected by him from business in this State, and the custom and practice of the St. Louis office to send to the resident agent from time to time such amounts of money as were needed to defray current expenses, which was more than the amount derived from income in this State. Under this custom and practice, the money collected in this State only remained on deposit in this State until in ordinary course of banking it

could be forwarded to the St. Louis office, and the money received from the St. Louis office only remained on deposit here until it was paid out to defray expenses, which was usually only a short time. None of the money thus transmitted to this State was invested here, or lent out, or kept here, except for the time and purpose stated.

It should be stated as a very pertinent and material fact that there is no charge that this practice and custom was resorted to or followed with the purpose of evading the tax laws of the State. It was simply the method the appellant had adopted to carry on its business, a method made necessary in part by the failure of the income to meet expenses. The Commonwealth places its right to tax this money in bank solely upon the ground that as the appellant was engaged in business in this State, having a resident agent here, the money on deposit to its credit in the banks in this State was subject to taxation to the same extent as if it was the money of an actual resident of this State who had it on deposit for the purpose of paying his current expenses. Of course, if this rule should be applied, the money should be taxed, as deposits in bank are the subject of taxation. They are mentioned as one of the items of taxable property in the schedule the taxpayer is to sign and are assessible like other property, and if these deposits had been placed in the bank to the credit of a resident owner, they would undoubtedly be subject to taxation except to the extent that they were diminished by outstanding checks. But under the undisputed facts, our conclusion is that the situs of this money for purposes of taxation was not in this State, but at the residence of the owner in St. Louis. We do not think the right to tax the money of a non-resident that is in this State for the mere temporary purpose of paying debts due in this State or defraying expenses incurred in this State could be sustained upon the ground that it had a situs in this State. The exception to the general rule that money and intangible property has only a situs for taxation at the residence of the owner is put distinctly upon the ground that the owner by his conduct in relation to it or his manner of doing business with it has given it what may be termed a permanent situs in some other State or locality. It is the permanent feature of the thing that

gives the property its situs for taxation in some locality or State other than the residence of the owner.

But, in ruling that this money was not subject to taxation, we do not depart in any particular from the principle laid down in the Dun & Co. case.

If it was shown by fact or circumstance that the income here exceeded the expenses of the business, or that the practice of sending out of this State the money derived from business done in this State, and the returning to defray expenses of money to take the place of that sent out, was a device or scheme to evade the tax laws of the State, we would have no hesitation in holding the money subject to taxation. If a non-resident doing business in this State could evade taxation upon money in bank by merely adopting a course of business by which all the money collected here should at once be remitted to him, and in turn he would forward to this State the money to conduct the business, such scheme, if successful, would furnish an easy and simple method of escaping taxation on deposits. But it is scarcely necessary to add that such a scheme would not accomplish the purpose intended.

It is further suggested that the levy made by the fiscal court of Lyon County for each of the years 1905-1909 was void, because in making the levy the court did not observe the requirements of section 180 of the Constitution, providing in part that—

"* * * Every ordinance and resolution passed by any county, city, town or municipal board or local legislative body levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

The levy made by the fiscal court recited that it was made "to defray the current expenses, such as salaries, maintenance of paupers, building of bridges, working of roads," and we think it was a sufficient compliance with the Constitution. Pulaski County v. Watson, Sheriff, 106 Ky., 500. But, aside from this, the question of the validity of the levy is not involved in this case. If no levy at all had been made for the years named, or if the levy made was fatally defective, it would not interfere with the assessment of property. The validity of the levy can only be assailed when it is sought to collect taxes under it. This proceeding is merely for the purpose of having the property assessed.

The judgment of the lower court in so far as it assessed the land is affirmed; in so far as it assessed the money on deposit, it is reversed. On the whole case, the judgment is reversed, with directions to proceed in conformity with this opinion.